All right, Mr. Franklin. You're more than ready, probably. Thank you, Your Honor. I'm here to support Jonathan Franklin for the impelment of NewStar. Given that our briefing in the Maritime Lean question was effectively overtaken by this Court's decision in Valero, I'd like to focus today on the second issue in our brief, which is the District Court's separate determination that IMG was validly assigned a maritime lean. While we disagree with the Court's decision in Valero, we recognize that it is the law of the circuit, and we do want to preserve our arguments in the event Your Honors can perceive a distinction in the case or in the event we seek further review in the en banc court or in the Supreme Court. I'd like to turn, if I might, to the assignment issue. Of any of those cases, it's not just our circuit. A few others have addressed it. Have any of those been appealed to the Supreme Court that you know of? Not yet, Your Honor. Not yet. Do you know if en banc is being sought in any other circuit? En banc was sought in Valero. Right. Any other circuit? It was sought in the Second Circuit and denied in the Second Circuit. I do not believe it was sought in the Eleventh, and I don't know about the Ninth Circuit. Well, it's a close question, divided the panel, and I understand not surrendering on the issue. We do believe that we would satisfy Judge Haynes' test, but unfortunately for us, it was in a dissent. Well, she's in the building, I think, if you want to satisfy her. I appreciate that, Your Honor. Now, IMG did not challenge our right to appeal the district court's determination on the assignability issue, but this court has requested and received supplemental briefing on the standing issue, and as we have explained in our supplemental brief, Newstar has standing to appeal that issue for at least two reasons. First, as we stand here today, there has been no adjudication of Newstar's maritime lien question, and we believe that we have the right to challenge IMG's assertion of a competing lien to the same funds that we are also asserting. Second, if one were to look at the question from what would happen if the court denies our lien claim, which I actually think is more of a mootness question than it is a standing question, we still think that the court should adjudicate that claim. As we have explained in our supplemental brief, Newstar is a creditor in the OW bankruptcy, and we have presented a nonspeculative argument as to that any funds, any non-lien recovery that IMG would obtain in this case would automatically become part of the bankruptcy estate. Because IMG has turned over to the Bankruptcy Liquidating Trust all of its interests in OW USA's rights to receive payments under the supply contracts, which include its rights to receive the substantial receivables from OW Far East in this case. But if IMG doesn't have a lien, let's say you're right about that, wouldn't the money go to OW Far East in the foreign bankruptcy? If they don't have a lien, it would be remanded for consideration of an impersonal claim that would not have been resolved. They say they have a settlement that doesn't kick in if it's remanded. We don't know what would happen there, Your Honor, and I will tell you that the money is actually sitting with us. It is in an escrow account that is maintained by my co-counsel's law firm, and it is subject to any order of the district court. So it wouldn't just go to the bankruptcy anywhere, and we think it should go. If they don't have a lien, it should go to the OW USA bankruptcy. And I think it's notable that in the IMG's supplemental brief, they say to the court, oh, no, it wouldn't, but they never explain why. And we have put forward specific provisions of the OW bankruptcy liquidation plan that we believe mandate that it is part of that recovery. Suppose IMG takes it as a signee of OW Far East. That money immediately is receivable to OW USA. IMG never perfected its security interest in the U.S. bankruptcy and has turned over to the bankruptcy trustee all of its rights in OW USA's recovery. Now, we're not asking this court to resolve these bankruptcy issues. All we're saying is we have presented a nonspeculative argument that in the event this court does reverse on the lien assignment issue, we have – it would affect us. We are a creditor in the bankruptcy. Necessarily, an increased recovery to the estate benefits us. If I might turn to the merits of the – I would certainly add to the questions on the standing issues, what I would think of as a mootness issue. On – oh, I would also ask that in the event the court does determine, if the court determines that we don't have standing to raise this claim, or otherwise that the court doesn't have jurisdiction to consider it, we ask that the court make clear that the adverse decision that we suffered on this issue in the district court is not binding on us in other cases. We're litigating this issue in other cases against IMG, either by vacating that determination or by making clear, as in the Second Circuit case that we cited in our supplemental brief, that because it was a jurisdictional determination, it would not be binding in a future case. But a district court decision would never be binding. No. It would be persuasive. Well, it would be binding because it was a final judgment. Oh, you're saying as to this – as to this – On the assignment issue. Yes. We just say if we don't have the right to appeal it, it shouldn't be binding on us under preclusive principles. We would ask that the court make that clear so that we aren't suffering because of it in some other case. On the merits, IMG – How many of these cases are out there? There are a bunch that have been stayed in the Texas – I don't know the exact number. I think we submitted a – there's a lot, Your Honor. There's several in the Second Circuit, and then there's several in the Houston – that came out of the Houston. And that's just Newstar's case. There's a lot of other ones that Newstar was not the principal supplier in.  Yes. And I must admit I am not as familiar with what has been going on overseas. But, yes, this is a big mess, Your Honor. And ultimately – I hate to turn to the issue of the maritime liquid – we feel that we're the party that pumped $2.7 million-plus worth of fuel into these vessels, and the courts have been holding that it is O.W., a bankrupt entity that neither saw or paid for any of this fuel that has a lien for the entire amount, whereas we pump our own gas into their – our own fuel into their ships, and we get nothing except a bankruptcy recovery. That's for the Supreme Court, unfortunately, I think, or for this court on bond. Well, maybe fortunately. The Supreme Court might just take it. There's a lot of money at stake. I hope they do, Your Honor. And anything Your Honors can say to help us would be nice. On the maritime assignment issue, IMG does not have a valid assignment of any maritime lien for two reasons. First, the security agreement nowhere mentions maritime liens and gives IMG only a right to – rights in respect of O.W.'s supply receivables, which are defined as amounts owed under supply contracts. A maritime lien is entirely a creature of U.S. statutory law that exists without regard to contractual rights and does not depend on a contract for its existence. So we believe under the proper reading of the agreement, which doesn't mention maritime liens, it is not – does not cover a maritime lien, which, by the way, does not even exist for these kinds of things under the law that they chose to govern it. If we agree with you on that, would that create a split with Barcliffe in the Eleventh Circuit? On that issue, I think it would, Your Honor, and we don't think the court really undertook the kind of analysis that we are advocating here. The second point, though, is not one that the Barcliffe Court looked at, and actually I think is a quite strong point, and that is that under – that the party's experts in this case agree that a maritime lien is non-assignable under English law, which is the law that the parties chose to govern their assignment and which, under the cases that we have cited, is the proper law to determine whether or not the right is assignable. We have cited the Martin case. We have cited three other cases, all of which hold that the law governing the assignment determines whether the assignment is valid. In this case, English law is crystal clear, so clear that their expert didn't dispute our expert on it, that maritime liens are non-assignable. They chose that, and we cited a case called New Falls in our reply brief, and we cited all these cases. They have cited no case for the proposition that U.S. law governs the validity issue of the assignment. It seems like they're trying to say that English law, though, would allow it through their own choice of law or conflict of law principles would allow an assignment of a U.S. lien. They've cited nothing for that proposition, Your Honor, and I would like to quote, if I might. I don't like to quote from a decision, but this one is particularly, I think, persuasive. This is a decision that we cited in our reply brief called New Falls at 292. Page 292 of the court says, Where parties choose to transfer rights under the law of a state that has a well-known prohibition on the assignment of certain rights and claims, it is a bit difficult for one of those parties to then claim it should have had that claim assigned to it  Parties choose to contract away rights that would otherwise be afforded to them all the time. Merely because the law of the state where the claim arose is more permissive than the law expressly agreed on by the parties to govern their assignment is not a sufficient reason to void that choice of law and restore those rights. That is exactly the argument that we're making here. They chose English law, and I think, frankly, that goes to our first point, that the agreement doesn't say anything about maritime liens. I think it's probably because they knew that under English law you can't assign maritime liens. The law that they chose to govern their assignment is the law that determines the assignability, and the experts here are in agreement that that law does not permit the assignment of a maritime lien. It's that simple, and this court's decision in Martin also holds. In that case, it was an antitrust claim, and the court said while the antitrust claim is governed by federal law, the question of its assignability is governed by Louisiana law, which is the law that would govern the contract. In the New Falls case that I just read from, it was a malpractice claim where the malpractice claim itself was under Connecticut law, but the party's assignment was under California law, and the court said under California law it is clear malpractice claims are not assignable. Therefore, I will enforce the law that the parties agreed to and hold that this claim is non-assignable under the law that they chose to govern their assignment. Let me understand what you're saying in response to Judge Costa a little while ago. It seems to me that there is at least some authority cited to us that under English choice of law rules, they would permit the assignment so long as it was United States, created in the United States. I won't give you cites back if you say they aren't any cites. Some have been found. Is your point, I don't think there's case law that has actually done that in this country that would say despite the facts of this case, we would apply choice of law rules since we're not in England and we're not dealing with it over there. What is your argument? Either that that law doesn't exist in England, that that's not their choice of law rule, or that it really doesn't matter because it's inapplicable in light of this case being brought here and we apply the law as you've already set it out. I think that the law chosen by the parties to govern their agreement is the law that applies to determine the validity, and in this case it's English law. There's been no statement by their expert that English law would somehow allow an assignment of a U.S. lien, if I'm following your question, even though it doesn't allow an assignment of an English lien, and the reason that the English courts don't allow it is because these are things that travel with the ship. These are personal rights under English law. They are not assignable because the ship can change ownership and these liens are out there, and then if there's an assignment and another one and another one, there could be all sorts of people coming in on this, and that's sort of the reason, but the art experts cited and quoted from the Sparty, which was a decision decided in 2000 under English law, I believe in Hong Kong, that was quite clear that maritime liens are not assignable under English law. They've cited no case that shows that in these circumstances, you would disregard essentially the choice of law that they put in their own agreement, and I think that does bear on the first question, if I might. But I just want to tie this up. So you're saying because they chose English law that that's English substantive law, which doesn't allow assignment of liens to be assigned, and we shouldn't look to how English courts would handle a conflicts analysis because the choice of law is saying is eliminating that process and saying, no, we're agreeing to substantive English law. Yeah, and they haven't made that argument. I don't see it anywhere here. If I might reserve the remainder of my time. Certainly. They please the court, Bruce Paulson for ING Bank. Three, essentially three things that I'm going to address, try to address. One, that Valero mandates affirmance of the result below, and there's no conflict with Barcliff, that Neustadt lacks standing to challenge the assignment, and the assignment is valid. So I'll start with the assignment, which we were just discussing with Mr. Franklin. It is clear from the face of the documents the broad intent of the security agreement. ING Bank is a security agent for a group of lenders that bargained for broad security to secure its $700 million revolving borrowing-based credit facility, which provided O.W. with its operating capital. Without that working capital, O.W. wouldn't be able to operate. It was an agreement designed to work on a global scale. This was a company that worked worldwide, and there are hundreds of litigations worldwide, and 55 in the United States, just in case you're still wondering about that. Section 2.3 of the agreement and a number of these provisions show the breadth of the language, and Mr. Zaccaroli, our English law expert, gleans the broad intent of the parties in entering the security agreement, and he doesn't, as Mr. Eggers posits, try to get in the heads of the parties when we negotiate this. It's obvious from the face of the document. A receivables charge order, such as O.W. Farre's, assigns and assigns absolutely all rights in respect to supply receivables. Supply receivables involve any amount owed or to be owing under any supply contract. A supply contract is any contract, and there's some extra language in here, or the overarching general terms and conditions of the proof and any invoice thereunder. Section 5.7 says the security agent, which is ING Bank, can exercise any rights in connection with a security asset, and the definition of security asset, which is found in Section 1.2, is extremely broad. It includes all present and future properties, revenues, and rights of every description. This is extremely broad language, and the purpose is clear. And Judge Stanton, in the Tamara decisions that we forwarded to the Court last week under cover of the 20HA letter, analyzed, as did Barcliff, as did Judge Ellison in this case, as did at least one other district court judge, and the Eleventh Circuit had upheld the assignment. Mr. Wright is there, actually, with the limit recovery to amounts that are assigned under supply contracts, but that is too narrow. This is a broad agreement. It is true that under English law, English law liens, which are maritime liens, are different animals than U.S. maritime liens, are not assignable under English law, but this is a U.S. law right. All rights are assigned under Section 2.3 of the agreement, and both experts agree that under English law, and Judge Stanton echoed this just last week, that statutory rights are assignable under English law. Liens in the United States, maritime liens, which are freely assignable under President Arthur and many, many decisions, are statutory rights. They arise by statute, not by contract. They are assignable under English law and assignable here. With respect to standing, in this case, Mr. Franklin didn't mention in his presentation that OWUSA was a party to this case. It disclaimed interest in this case and backed out, so it's not seeking to recover those amounts. The claims here are seeking to enforce rights in rem against non-debtor vessels. OW Far East hasn't been served and never appeared in this case either. There are, in this case, as there are in all these actions, a number of different insolvencies that caused the music to stop when OW collapsed overnight in the fall of 2014. OW Far East is an insolvency. There are three OWUSA-related insolvencies in Connecticut. But under the three-part Lujan test, where to have standing they have to show injury in fact, a causal connection between the behavior component of the injury, and New Star has no injury here, with respect to the assignment in the air, whether this court finds the assignment is valid or invalid, is of no moment to New Star. The notion that it will somehow... If you don't get the money, where would it go? If we don't get the money, it's not our money. It belongs to the ship owners. Not ours. It doesn't belong to OW Far East. I don't know if they're seeking an insolvency. I'm not a party to that. But we do have a chance to, if there's a reversal here, go back and enforce our inputs on the rights. If that's the case, we recover. So the three-part Lujan test cannot be met by New Star here. And there's no injury in fact, and the redressability requirement of Lujan cannot be met, because the fact is, without a lien, they have no interest whatsoever in what happens to that assignment. That assignment that is affirmed by now three district courts and one circuit court. The basic argument, it seems to me, is that somehow this money has a sufficient prospect to get into the bankruptcy estate of OW USA and increase the availability of funds for all debtors, creditors of that debtor. What is not clear to me, and Judge Costa just asked you about it, is how we can trace where the money would go depending on what results this court enters. You just gave an answer to part of that. But if in fact this is OW Far East money, elaborate on that sum. What happens to the money if we say, if we uphold in part at least the argument of your friend on the other side? OW Far East is bankrupt and insolvent in Singapore. It was the contract supplier here. It was a receivables charger under the security agreement and assigned all rights, title, and interest to its receivables, 100% of its receivables, to the lender group for which ING Bank is the security agent. In their papers, New Star indicates that ING would recover this money sort of outside or bypassing the bankruptcy process. But the fact is it's assigned these rights as a secured creditor. If for some reason it didn't have those rights, the assignment wasn't valid, or if it didn't have a lien, or if it didn't have a contract claim, all of it should be assigned by OW Far East. I don't see a mechanism for how this money somehow gets to the OW Far East estate and then somehow flows downhill between two insolvencies of different companies in foreign countries to OW USA enhancing recoveries for creditors there. Now maybe there's something in the bankruptcy documents that I'm missing, but I don't think so, that would create that flow of funds from these lawsuits from the security posted by the ship owners who are the defendants here, the in-rem defendants, back to OW Far East, back to OW USA. I'm sorry, I don't really have an answer to that, but I don't think— So you think it might go back to Costco as the—I mean, it's their money to begin with, right? It's their money and nobody has a right to it. That's what seems to me happens here. But why wouldn't OW Far East have a right to it as the direct contractor? I don't know if they've asserted it. In the time I have left, I'll just make a quick point that with respect to Valera and the maritime lien, in this case the four circuits that have considered the issue have reached nearly uniform results that we all know it's a three-part test under the statute for a maritime lien. You provide necessaries to a vessel on the order of the owner or a person authorized by the owner. There is, under Section 3.141 of the statute, a list of persons presumed to have authority to bind the vessel to maritime liens. In this case, Newstar took its order from OW USA, not a person with authority to bind the vessel. In those situations, under Lake Charles, under Valero, under Barcliff, Tamara, and Bunker Holdings, a subcontractor such as Newstar does not have a maritime lien as a general rule. You look to the nature of the relationships, usually using Lake Charles language, to see if they have a lien. There's a couple of ways of doing that. There's the middleman agency line of cases. Ken Lucky and the Ninth Circuit, they relied on that for the notion that they didn't have to show agency, but that's now been debunked by Bunker Holdings and all the other decisions that ensued the Ken Lucky decision. Or you have to show that the shipowner controlled the selection or directed the selection of the subcontractor, pretty much to the extent that the contractor was acting as the agent, the owner, in selecting the subcontractor. That did not happen here. Because Newstar can't meet the test, it doesn't have a lien. ING has the lien as the assignee of OW of Barcliffs. Thank you. All right, Counsel. May it please the Court. Gina Bonegia here for Costco, the vessel owners. I want to speak first about the assignment issues. While we do not necessarily have a force in that race, I think there are a couple of points that bear mentioning. First, the money that is sitting in escrow was posted by Costco and serves as interpleader security. When Costco was faced with claims, maritime lien claims from Newstar and contractual and lien claims from ING, Costco utilized the interpleader remedy. The use of the interpleader remedy was challenged and it was upheld by the district court. This is at Docket 56 in the district court. There's been no challenge in this court that interpleader was inappropriate. Therefore, the funds remain as security for whoever is determined to have the right to the money, whether on a lien claim or a contract claim. The other point I'd like to—and there's been no challenge to the assignment insofar as the assignment of the contract claim. I would also like to add that if the district court is reversed on the scope of the assignment and whether it encompasses maritime liens, this does not mean that the district court's ruling on Newstar's lien rights or the lack thereof should be reversed or vacated. The assignment ruling is not the flip side to the ruling on whether Newstar has a lien. If, however, the district court is reversed or modified on the question of whether Newstar has lien rights, then we maintain that the partial final judgment that was entered is to be vacated and the case is to be returned to the district court to assess the impact of that reversal on the interpleader and breach of contract issues that were left unaddressed by the district court because they were rendered moot once the district court determined that Newstar had no lien rights. The claims in the district court, the competing claims, consisted solely of Newstar saying it had a lien right and ING saying it had a lien and contract right. Once the district court determined that Newstar had no lien right, then ING was determined rightfully to be entitled to the money. Now, with respect to the lien issues, I appreciate counsel's recognition that Valero controls and overtakes their briefing and their arguments, if that is correct. But to the extent they intend to seek rehearing and bonk, I would like to share our comment on the lien issues to the benefit of this court or anyone who may listen to this argument down the road. I would also like to confirm to this court that rehearing and bonk was sought in the Second Circuit. We were involved in that appeal and it was denied. Rehearing and bonk was sought in this court in Valero and it was denied. We can also confirm that in the cases in the Second Circuit, the time for those physical suppliers to seek petition for certiorari has expired and as far as we know, there has been no such filing. I also understand that in Valero, the time for them to seek petition for certiorari to the Supreme Court has expired and counsel in that case confirmed to me yesterday that no such petition for certiorari was filed. Now, Newstar's counsel mentioned, you know, in passing, about the sympathies. The sympathy is that Newstar supplied all of these bunkers millions of dollars and is left unpaid. I would like to point out that Newstar is not unsophisticated. It had a longstanding relationship with OWUSA. It had sold over $200 million in bunkers to OWUSA in a year, and it had extended OWUSA $40 million in a line of credit. These same sympathy ideas were expressed to the Eleventh Circuit in the Barcliffe case and to the Second Circuit in the Tamara case, and I think those courts' treatment of the sympathy cries merits noting. The Eleventh Circuit explained that we recognize the physical supplier is left perhaps holding the bag, if you will, but it chose to contract solely with an OW entity, and it chose for that entity to be its contracting partner and thereby be a creditor of that entity. It was the physical's right to gamble, but its choice should elicit no sympathy. That's footnote 15 in Barcliffe. In Tamara, the Second Circuit said we are not unsympathetic to the physical supplier's position. It's left without perhaps having any recourse, but this result is a frequent one in insolvencies. An unsecured creditor, such as the physical supplier, who took an unsecured risk stands in line behind the secured lenders. That's in the Tamara case. Those same concerns apply here. I would like to also address on the lien issues that it's not just Valero that puts Newstar's arguments to rest. It is the plethora of circuit precedent that we now have, as well as a district precedent, in cases that involve the exact same facts in the exact same sequence of contracts. Newstar argued that strict-type jurors is disfavored in this circuit and has no application to the issues in this case. That has been dispelled by Valero, page 292, and footnote 6. Barcliffe, page 1070, Tamara. He's conceded that, hasn't he? Well, you may have conceded it, but, again, Your Honor, I do not agree with each one of these, but, again, it's for the benefit of I recognize he's conceded it today, but he's also indicated that they intend to seek petition for rehearing perhaps, perhaps. And so to the extent anyone is listening, I'd like to point that out. But I appreciate your comments, and we can move on. Let me suggest to you that it's more likely that a petition for rehearing response would be read than that this oral argument would be listened to. Then I appreciate your comments, Your Honor, and unless you guys have any questions for me, then I will end with that and just reiterate that we submit that the district court's lien ruling should be affirmed. All right, counsel. Thank you. Thank you, Your Honor. As much as I would like to respond to everything that Ms. Dinesia has said, I will only leave it with this. We were not an unsecured creditor in our view. We did have security, which was the lien the statute provided us, and that may be for another day. Turning, if I might, to Mr. Paulson's points, I think I'd like to start with Judge Southwood. The question you asked was where is the money going, and I really tried to write down the answer, and I don't think I got one. And I really felt like I didn't hear where it was going to go. What he did say, though, was that there may be something in the bankruptcy plan that I'm missing, and the answer is yes, he is missing something. We have cited the provisions, and I'll cite them to you. We don't have it in the record, but I'd be glad to submit it. We've cited the place where the court can find it. It's a public document. Page 28, Article V. On the effective date, the IMG Bank's security interest shall be fully and finally transferred to the liquidating trust. What that means is that the OWUSA liquidating trust has received all of IMG's rights under the security interest as it respects receivables owed to OWUSA. OW Far East was never served in this case. The money is not going to OW Far East. They are not a party to this case. Misdemeanor is right about one thing. We did not challenge the assignment of the contractual right that IMG is asserting and still is asserting. They have an impersonal claim that will be resolved on remand against the vessels. The way that works under the bankruptcy plan is that they will take that money, presumably as the assignee of OW Far East, which is not a party to this case. It then immediately is a receivable owed to OWUSA. The way these contracts work, the vessel contracted with OW Far East, OW Far East contracted with OWUSA. That receivable is a property of the bankruptcy estate. We believe it is. We have explained why it is. We have been met with silence on the other side. There is nothing that they have said that refutes that point. The point that needs to be made here is that that means there is concrete adversity here on appeal on this issue, and the court can decide it. What happens later is a question for later. Let me turn to the merits, if I might. Mr. Paulson mentioned an argument that these are something akin to statutory rights in rem under English law. We point that argument in our opening brief. They did not respond to it. It has been weighed, the argument that this is somehow treated as a statutory right in rem. As we explained in our opening brief and as our expert testified on pages 18, 52, and 53 of the record, statutory rights in rem are essentially in personam claims. They are not maritime liens. Mr. Paulson said a maritime lien is a different animal under English law. It is actually not. The only difference is they don't recognize a maritime lien for bunker supplies or necessities in the same way that American law does. But they recognize lots of other maritime liens just like American law does. If we think there is some uncertainty about English law, should we send it back to the district court? I mean it can hold a hearing with these experts and try to straighten it out. There are procedures for that in a trial court that we don't have. The court could do that, yes. The question is ultimately one of law, but if the court finds that the experts differ, then the court could. But I don't think the experts differ on what I think is a key point, and that is, is the lien assignment under English law? And the question – the answer is no, it is not. Our expert has testified. Their expert says I essentially agree with their expert, and he brought up the statutory in rem argument, which they have now weighed on appeal. So I actually don't think there's a dispute on that point, Your Honor. Finally, he mentioned O.W. has disclaimed rights when they dismiss themselves as a party. I think it's important to know what the rights they disclaimed were. They disclaimed rights against the vessel. They did not disclaim rights against IMG. So the vessels here interpleaded, as Venezia said, the funds. We don't know who we owe them to. And the O.W. says, well, you may owe them to somebody, but we're not directly owed those rights. And that's not our argument. Our argument isn't that O.W. USA is directly owed those rights. They are owed them, though, from O.W. Far East. So IMG recovers as the assignee of O.W. Far East. Those become property of the bankruptcy estate. If the bankruptcy trustee is not willing to assert those rights, Newstar will either in this case or in the bankruptcy where we're a party. I guess that's the end of my argument, and I'd like for it to reverse at least on that issue. Well, this case has been brought many places, but it's certainly a fascinating one. Thanks for your help in our understanding it. We'll take a brief recess before the next argument.